

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00080-CV

THE CITY OF THE COLONY, TEXAS        APPELLANT

V.

MARK AND KIM RYGH        APPELLEES

----------

### FROM THE 431ST DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. 15-00533-431

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

The primary question in this interlocutory appeal from the denial of Appellant The City of The Colony, Texas's jurisdictional plea is whether a nexus

---

[1]*See* Tex. R. App. P. 47.4.

exists between the City's use of a "Vac" truck to clear a blockage in a sewer main and the property damage that Appellees Mark and Kim Rygh sustained when their residence flooded with raw sewage. Because we resolve that question in favor of the City, and because the Ryghs did not otherwise establish a waiver of the City's governmental immunity, we will reverse and render a judgment of dismissal.

## II. BACKGROUND

On the morning of April 23, 2014, the Ryghs awoke at their residence at 4033 Heron Cove Lane to discover that their toilets were stopped up and would not flush. Kim left around 7:15 a.m. to take her grandson to school, but she was back home by 7:30 a.m. Between then and 8:00 a.m., her residence "was completely flooded with raw sewage coming up from the toilets and the showers."

Meanwhile, at 7:15 a.m., Kim Rygh's neighbor Jimmy Harper notified the City that the "overflow" pipe on the side of his house at 4041 Heron Cove Lane was expelling sewage into his yard. The City promptly responded by dispatching members of its Water Distribution/Sewer Collection Division of its Public Works Department to the area.

Depicted in the following image by a brown line, a 15" sewer main runs under Heron Cove Lane and beyond that street's cul de sac through an unimproved area, with manholes located at the intersection of Heron Cove Lane

2

and Avocet Way (marked X-1), at the entrance of the cul de sac on Heron Cove Lane (marked X-2), and at an unimproved area southeast of Holden Circle (marked X-3):



Maintained by the City, the sewer main is "entirely gravity flow," flowing downstream in a northeasterly direction, as denoted by the arrows in the image along its route. Residential properties tie in to the sewer main via lateral lines. The Ryghs' residence is adjacent to the manhole located at the intersection of Heron Cove Lane and Avocet Way (X-1).

3

City employee Marco Chavez arrived in the area around 7:30 a.m. and noticed sewage flowing out of the manhole located at the intersection of Heron Cove Lane and Avocet Way (X-1). Suspecting that the sewer main had a blockage, and knowing that the sewer main flowed downstream in a northeasterly direction, he determined that the blockage had to be located at some point northeast of the manhole, causing sewage to back up towards the residences located upstream along Heron Cove Lane and into their laterals.[2] Chavez therefore headed to the next downstream manhole—located at the entrance of the cul de sac on Heron Cove Lane (X-2)—but it too was full of sewage. Chavez then made his way to the unimproved area southeast of Holden Circle—where the next downstream manhole is located (X-3)—but he was unable to open the manhole because it was covered with brush. Chavez radioed Hollis about the condition of the manhole and returned to Heron Cove Lane to check on the upstream manholes.

---

[2]In his affidavit, City employee Bobby Hollis explained how a blockage is located:

> [T]he crew takes manhole covers off to see if sewage in the main is backed up into the manhole. If so, they continue downstream until they eventually locate a manhole that is dry. When a dry manhole is located[,] they know that the blockage in the main is between the dry manhole and the last upstream manhole that contained sewage that had backed up into it.

4

When Hollis arrived at the unimproved area southeast of Holden Circle, he cleared the brush from around the manhole, opened it, and discovered that it was dry inside, meaning that the blockage was located somewhere between that manhole (X-3) and the upstream manhole located at the entrance of the cul de sac on Heron Cove Lane (X-2). Hollis radioed to his crew to bring the Vac truck to nearby Holden Circle.

In his affidavit, Hollis explained what the Vac truck is and how it functions:

The Vac truck consists of a Sterling Anterra vehicle. In the front of the vehicle there is a reel that contains approximately five hundred (500) feet of hose. The hose is blue in color except for the leader hose which is black in color and is approximately twenty (20) feet long. When used to clean a blockage in a sewer main, a cleaning nozzle is attached to the front of the leader hose. The Vac truck is powered by the engine of the truck and switches which activate a PTO ("power take off") [that] sends pressurized water from the tank located on the back of the truck through the hose and eventually to the nozzle.

. . . .

. . . [T]he nozzle . . . is lowered [down the dry manhole and into the sewer main via a horseshoe shaped trough or invert], the PTO is activated[,] and pressurized water is propelled *downstream* out of the back of the nozzle[,] which propels [the nozzle] *upstream* toward the blockage. Initially, about 800 psi ("pressure per square inch") is used so that the nozzle can begin moving forward approximately 3 to 5 feet past the opening in the invert and out of sight. At that point, the psi is increased to approximately 2,000 to 2,500 psi[,] and the nozzle is propelled forward upstream in the main much like a jet ski until it strikes and breaks through the blockage[,] which allows the sewage backed up behind it to flow downstream toward, through, and past the downstream dry manhole. [Emphasis added.]

After City employee Robert Willis arrived with the Vac truck, he affixed the nozzle to the hose and lowered it into the sewer main through the invert facing upstream. The crew activated the PTO, which pressurized the water through the hose and propelled the nozzle forward, simultaneously discharging water downstream. The nozzle travelled upstream ten to fifteen feet before it encountered the blockage, but it failed to break through it. Willis pulled the hose back and released it, and on this second attempt, the nozzle broke through the blockage, causing the sewage to immediately begin flowing downstream away from the residences on Heron Cove Lane. Chavez, who was positioned at the upstream manhole located at the entrance of the cul de sac on Heron Cove Lane (X-2), saw the sewage immediately begin to recede in the manhole. At some point soon thereafter, Hollis met Kim, who showed Hollis that sewage had backed up into her residence.

The Ryghs later sued the City, alleging that its employees' negligent use of the Vac truck to break through the blockage in the sewer main had caused the sewage to back up into their residence. The Ryghs also alleged that the employees were negligent for failing to notify them—either before or after the employees used the Vac truck—that their residence could be flooded with raw sewage. The Ryghs averred that their residence had sustained damages in the amount of $68,795.94. The City filed a motion for summary judgment or,

6

alternatively, a plea to the jurisdiction, arguing that the Ryghs had failed to allege any claim within the Texas Tort Claims Act's (TTCA) limited waiver of immunity. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021 (West 2011). The trial court denied the motion and plea, and this interlocutory appeal followed. *See id.* § 51.014(a)(8) (West Supp. 2017).

### III. THE CITY'S GOVERNMENTAL IMMUNITY REMAINS INTACT

In what we construe as its first and second issues, the City argues that the Ryghs failed to invoke the trial court's subject-matter jurisdiction by establishing a waiver of the City's governmental immunity under TTCA's motor-vehicle exception—the only provision of the TTCA that the Ryghs rely upon to show waiver. Specifically, the City contends (1) that its employees' use of the Vac truck did not, as a matter of law, cause the Ryghs' residence to flood and (2) that the employees' alleged failure to notify the Ryghs that their residence could flood did not relate to the employees' operation or use of the Vac truck. The Ryghs respond that their claims fall within the TTCA's motor-vehicle exception.

### A. Standard of review.

A plea to the jurisdiction is a dilatory plea that seeks to dismiss a cause for lack of subject-matter jurisdiction. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Immunity from suit defeats a trial court's subject-matter jurisdiction and, thus, is properly asserted in a plea to the jurisdiction. *See Tex. Dep't of*

7

*Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (2004). We review the trial judge's ruling denying a jurisdictional plea based on governmental immunity de novo. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

A plea to the jurisdiction may challenge either the pleadings or the existence of jurisdictional facts. *Miranda*, 133 S.W.3d at 226–27. When a plea to the jurisdiction challenges a plaintiff's pleadings, we consider whether the pleader has alleged sufficient facts to demonstrate the court's subject-matter jurisdiction over the matter, construing the pleadings liberally in favor of the plaintiff and looking to the pleader's intent. *Id.*; *see City of Waco v. Kirwan*, 298 S.W.3d 618, 621 (Tex. 2009). If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues that have been raised. *Miranda*, 133 S.W.3d at 227. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

## B. The TTCA's motor-vehicle exception.

Governmental immunity protects political subdivisions of the State, including cities like the City, from lawsuits for money damages unless immunity has been waived. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374

8

(Tex. 2006). The TTCA provides a limited waiver of immunity for property damage that is proximately caused by the negligence of an employee acting within the scope of his employment if (i) the damage "arises from the operation or use of a motor-driven vehicle" and (ii) "the employee would be personally liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1). The City's arguments home in on the former statutory language.

The supreme court has repeatedly clarified that the phrase "arises from" requires a nexus between the operation or use of the motor-driven vehicle and the plaintiff's personal injuries and property damage. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 543 (Tex. 2003); *LeLeaux v. Hamshire-Fannett ISD*, 835 S.W.2d 49, 51 (Tex. 1992). This nexus requires more than mere involvement of property; the vehicle's operation or use must have *actually caused* the injury. *Whitley*, 104 S.W.3d at 543. Thus, the operation or use of a motor vehicle "does not cause injury if it does no more than furnish the condition that makes the injury possible." *Id.* (quoting *Dallas Cty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex.), *cert. denied*, 525 U.S. 1017 (1998)).

As for the terms "operation" and "use," we define them according to their ordinary meanings. *See Mount Pleasant ISD v. Estate of Lindburg*, 766 S.W.2d 208, 211 (Tex. 1989) (for purposes of motor-vehicle exception, defining

9

"operation" to mean "a doing or performing of a practical work" and "use" to mean "to put or bring into action or service; to employ for or apply to a given purpose").

**C.**  **There is no causal nexus between the City's use of the Vac truck to clear the blockage and the sewage that flooded the Ryghs' residence.**

The jurisdictional evidence demonstrates that Willis lowered the nozzle into the sewer main so that when the water on the Vac truck was pressurized, it propelled the nozzle upstream toward the blockage and the pressurized water downstream away from the blockage. Thus, as both Willis and City employee Gerardo Vasquez explained in their affidavits, no water was sent upstream toward the residences on Heron Cove Lane, including the Ryghs' residence, which was estimated to be a lengthy 423 feet upstream from the blockage. As for the nozzle itself, when asked at his deposition whether the Vac truck could have pushed the wastewater upstream when the nozzle broke through the blockage, Hollis testified,

A.   Nope.

Q.   How do you know?

A.   It's not how it works.

Q.   How do you know?

A.   It's designed and engineered to do this. It's not designed and engineered to flood houses.

10

Joseph Chase, Supervisor of the City's Water Distribution/Sewer Collection Division, echoed Hollis's testimony at his deposition:

> Q.     Okay.  But if there's a stoppage . . . and something hits that blockage to clear it, . . . does it just break the blockage in your estimation and your experience?
>
> Or does it . . . force the water back . . . .
>
> A.     It just breaks the blockage.

Once the nozzle broke through the blockage, the crew immediately shut off the pump that pressurized the water to send the nozzle upstream, and several City employees observed the sewage flowing downstream, away from the Ryghs' residence.[3]  In fact, according to Chavez, who was monitoring the next upstream manhole (X-2) from the time the crew lowered the Vac truck hose into the dry manhole (X-3) until when the blockage was cleared, at no point "did any water or sewage reverse flow and travel upstream back toward [his] manhole." Consequently, Hollis, Willis, and Vasquez each opined that the Vac truck did not cause the sewage to back up into the Ryghs' residence.

The only sentence in the Ryghs' response that gives us any pause is this one:  "Appellees' home did not flood until the line was cleared at approximately 8:00 a.m. or thereafter."  The record, however, does not support that statement.

---

[3]Chase confirmed in his deposition that "[w]ater doesn't run upstream."

Kim Rygh swore in her own affidavit that her residence was "completely flooded with raw sewage" "[b]etween 7:30 a.m. and 8:00 a.m."—not "at approximately 8:00 a.m. or thereafter." Thus, Kim's own affidavit contradicts the statement in her brief.

Moreover, the statement fails to coincide with the City's response times. Although Chavez arrived at Heron Cove Lane sometime around 7:30 a.m., Hollis did not clock in at work until 7:54 a.m., and Willis did not clock in until 7:59 a.m. Just before he left work to go to Heron Cove Lane, Hollis saw Willis and advised him that the sewer main was backed up and that he needed to respond in the Vac truck. After getting the Vac truck "set up and ready to go," Willis and another crew member headed over to Heron Cove Lane in the Vac truck. When Hollis discovered that the manhole located at the unimproved area southeast of Holden Circle (X-3) was dry, he contacted Willis, who was still en route, and told him to go to Holden Circle. After the Vac truck arrived there, the crew initiated the procedure to clear the blockage. Chavez recalled that it took him nine or ten minutes to drive from work to Heron Cove Lane without any stops.

Cross-referencing the employees' affidavits, if it took Chavez nine or ten minutes to travel from work to Heron Cove Lane, then it is safe to assume that it would have taken Willis a similar amount of time to drive the Vac truck from work to Holden Circle. If Willis did not leave work in the Vac truck until some point

12

after he clocked in at 7:59 a.m., then he and the crew could not have conducted the procedure to clear the blockage in the sewer main until sometime after 8:00 a.m.—after the Ryghs' residence had already "completely flooded with raw sewage."

The Ryghs alternatively argue that there are at least material fact issues apropos to "the exact cause of the flooding," but we are not tasked in this appeal with determining "the exact cause of the flooding." Our narrow inquiry here is instead limited to examining whether a causal connection exists between the City's use of the Vac truck and the damage that the Ryghs sustained to their residence.

The jurisdictional evidence conclusively establishes that the property damage sustained by the Ryghs did not arise from the City's use of the Vac truck to clear the blockage in the sewer main. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1)(A); *Whitley*, 104 S.W.3d at 543. The trial court therefore erred by denying the City's jurisdictional plea challenging the Ryghs' claim that the City's negligent use of the Vac truck caused their residence to flood. We sustain the City's first issue.

## D. The City's alleged negligent failure to contact the Ryghs did not involve the operation or use of the Vac truck.

The Ryghs additionally alleged that the City's employees were negligent for failing to notify them—either before or after the employees used the Vac

truck—that their residence could flood with sewage. Failing to notify the Ryghs had nothing to do with operating or using the Vac truck; it merely implicated human communications (or lack thereof). Insofar as there was any connection between the complained-of omission and the City's use of the Vac truck, it was far too remote to satisfy *Whitley*'s well-established nexus requirement. The trial court erred by denying the City's jurisdictional plea challenging the Ryghs' claim that the City's employees were negligent for failing to notify the Ryghs that their residence could flood. *See Tex. Dep't of Transp. v. City of Floresville Elec. Power & Light Sys.*, 53 S.W.3d 447, 455–56 (Tex. App.—San Antonio 2001, no pet.) ("[Appellees'] claim seeks indemnification under section 752.008 of the Texas Health and Safety Code based on [Appellant's] failure to notify [Appellees] before Neil began work on [Appellant's] pole. Therefore, the basis of [Appellees'] claim is [Appellant's] failure to notify [Appellees], which does not involve . . . the operation or use of a motor-driven vehicle."). We sustain the City's second issue.[4]

---

[4]Having sustained the City's first and second issues, we need not address its third issue arguing that an improperly installed clean-out pipe on the Ryghs' property was the sole proximate cause of the flooding to their residence. *See* Tex. R. App. P. 47.1.

14

## IV. CONCLUSION

Having sustained the City's dispositive first and second issues, we reverse the trial court's order denying the City's plea to the jurisdiction and render judgment dismissing the Ryghs' claims against the City for want of jurisdiction.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

WALKER, J., concurs without opinion.

DELIVERED:  December 14, 2017